# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1738

_____

Jolonda Roberts,                          *
                                          *
        Appellant,                        *
                                          *   Appeal from the United States
    v.                                    *   District Court for the
                                          *   District of Minnesota.
Park Nicollet Health Services;            *
Park Nicollet Clinic; HealthSystem        *
Minnesota,                                *
                                          *
        Appellees.                        *

_____

Submitted: December 14, 2007
Filed: June 24, 2008

_____

Before RILEY, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Jolonda Roberts was terminated from her position as a certified medical assistant at Park Nicollet Health Services. She filed suit against Park Nicollet and affiliated entities (collectively, "Park Nicollet"), alleging that the termination was motivated by her pregnancy, in violation of Title VII and the Minnesota Human Rights Act (MHRA). The district court granted summary judgment for Park Nicollet. We conclude, however, that there is a genuine dispute for trial, so we reverse and remand for further proceedings.

I.

Roberts began working for Park Nicollet as a certified medical assistant on September 13, 2004. Geraldine Lewis was her supervisor. Shortly after commencing employment, Roberts began to develop a record of tardiness. On September 14, 2004, she received an oral warning for arriving late on her first two days of work. Roberts signed a document memorializing this warning on September 17, but maintained that the employer had told her the wrong starting time or that she, Roberts, had misheard it. On September 29, 2004, Roberts received and signed another written warning for arriving late; this document warned that more tardiness "could result in further disciplinary action including termination." (Roberts App. 105).

After arriving late again on November 29, Roberts was suspended from work for three days. The document memorializing the suspension states: "This suspension represents the final stage of discipline. **Failure to meet the above expectations on an on-going basis will result in further disciplinary action up to and including termination of employment.**" (Roberts App. 108) (boldface in original). In a meeting about the suspension, the clinic manager, GeorgAnn Thompson, discussed Roberts's history of tardiness, and then told Roberts to consider resigning before the situation reached the point of a forced termination. (*Id*. at 82). Roberts later told Mark Nordby, Park Nicollet's employee relations manager, that she was warned at the time of the suspension that she would be terminated the next time she was late to work. (*Id*. at 118).

On December 2, Roberts notified Thompson that she intended to remain employed at Park Nicollet. Lewis says that Roberts was three minutes late to work on December 6. No adverse action was taken. Roberts was ninety minutes late to work on December 20, but the employer excused this tardiness, because a snowstorm had caused many employees to arrive late. Lewis also asserts that Roberts was 2.5 hours late to work on December 21, 2004, due to problems with caring for a sick

child, and that Lewis again explained to Roberts the importance of being on time. Roberts contends that her late arrival on November 29 was attributable to a scheduling mix-up, and she also disputes that she was late on December 6 or December 21.

The events immediately surrounding Park Nicollet's termination of Roberts occurred in January 2005. On January 10, Roberts learned that she was pregnant. Roberts had been scheduled to undergo a magnetic resonance imaging (MRI) scan on January 11 for a work-related injury to her arm, but she canceled the scan after learning of the pregnancy. In her deposition, Roberts testified that on January 10, supervisor Lewis asked her why she had canceled the MRI appointment, and Roberts told Lewis that she was pregnant. According to Roberts, Lewis sighed and asked, "What are you going to do about the pregnancy, are you going to keep it?" or "Are you and your husband going to keep it?" (Roberts App. 30, 36). Lewis denies that she made this remark, and says that Roberts first informed her of the pregnancy on the afternoon of January 11.

On January 11, Roberts called Lewis in the morning and said that she expected to be late due to traffic. Roberts asserts that she actually arrived on time, but Lewis testified that she personally observed Roberts arrive seven minutes late. That morning, Lewis decided that she wanted to terminate Roberts, and then consulted with Park Nicollet's human resources department about the matter. After receiving approval, Lewis met with Roberts on the morning of January 12 and terminated her employment.

Roberts testified that during the meeting on January 12, Lewis raised the topics of Roberts's pending workers' compensation claim for her arm injury, her pregnancy, and her tardiness. Roberts avers that Lewis then said that "because of everything, we have to let you go." (Roberts App. 34-35). Lewis denies asking Roberts about her pregnancy or her arm injury during the meeting.

Roberts contacted employee relations manager Nordby to dispute her termination. After investigating her complaint, Nordby explained that Lewis, in consultation with the human resources department, made the decision to terminate Roberts based on the November 29 suspension for tardiness, followed by late arrivals to work on December 6, December 20, and January 11. Park Nicollet now asserts that the December 20 incident was not considered in the decision to terminate Roberts, because the employer had excused this absence due to a snowstorm, but that Roberts was terminated for tardiness on the other dates.

Roberts brought suit against Park Nicollet for pregnancy discrimination under Title VII and the MHRA. The district court granted summary judgment for Park Nicollet, concluding that there was no genuine issue of material fact about whether the employer's stated reason for the termination was a pretext for discrimination. We review the district court's decision *de novo*, while granting Roberts, the non-movant, the benefit of all reasonable inferences from the evidence without resort to speculation. *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005). Summary judgment is appropriate if there is no genuine issue of material fact, and Park Nicollet is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

II.

A.

In defending the grant of summary judgment, Park Nicollet begins by arguing that there is insufficient evidence to show that Lewis, the supervisor, was even aware of Roberts's pregnancy before she made the decision to terminate Roberts. It is undisputed that Lewis decided to fire Roberts on the morning of January 11, 2005. Park Nicollet points to Roberts's complaint in this lawsuit, dated December 12, 2005, and her sworn charge of discrimination to the EEOC, dated September 30, 2005, both of which implied that Roberts notified Lewis of her pregnancy *after* the time of the

-4-

scheduled MRI scan, on the afternoon of January 11. Park Nicollet urges that these documents represent a fatal concession by Roberts that she did not notify Lewis of the pregnancy before Lewis made the decision to terminate Roberts's employment.

We agree with the district court, however, that there is conflicting evidence regarding when Roberts first notified Lewis of the pregnancy, and that taken in the light most favorable to Roberts, the evidence supports a conclusion that Lewis was notified before January 11. Roberts's first official statement of the chronology was in her application for unemployment benefits, dated February 22, 2005. In that application, Roberts stated that she told Lewis of her pregnancy on January 10, the same day that Roberts learned she was pregnant, and the day before Lewis decided to fire her. In her deposition in this case, Roberts also testified that she notified Lewis on January 10.

For purposes of summary judgment, the conflict in these statements must be resolved in favor of Roberts, unless the inconsistency represents only an effort by the plaintiff to manufacture a sham issue of fact. *See Camfield Tires, Inc., v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983). In *Camfield*, we held that the plaintiff did not create a genuine issue of material fact simply by submitting an affidavit that contradicted testimony at a prior deposition, where there were no "legitimate reasons" for the filing of an inconsistent affidavit. *Id*. at 1365. We observed that "[i]f testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment." *Id*. *Camfield* directed that district courts should examine inconsistent submissions "with extreme care," and limit the grant of summary judgment to cases where a conflict between deposition and affidavit presents "only sham issues." *Id*. at 1366.

We do not believe the dispute concerning when Roberts first notified Lewis of the pregnancy can be characterized appropriately as nothing more than a sham issue

of fact.  Roberts's earliest statement about the incident, made within weeks of her termination in an application for unemployment benefits, avers that she notified Lewis on January 10.  This is not a case like *Camfield*, therefore, where the plaintiff in the first instance provides information that is harmful to her case, and then attempts to replace it with a more favorable version.  Here, Roberts has been back and forth on the date, to be sure, but she started by identifying January 10 as the date, then shifted inexplicably to January 11, and eventually returned to January 10.  Under these circumstances, the question of when Roberts first notified Lewis of the pregnancy is a legitimate dispute for a finder of fact to resolve.  We will thus proceed to examine the grant of summary judgment on the assumption that Roberts informed Lewis of the pregnancy on January 10.

B.

Title VII makes it an unlawful employment practice to discharge an individual "because of such individual's sex," and "because of sex" includes "because of . . . pregnancy, childbirth, or related medical conditions."  42 U.S.C. §§ 2000e(k), 2000e-2(a)(1).  Under the 1991 amendments to Title VII, an unlawful employment practice is established when a complaining party demonstrates that sex (including pregnancy) was "a motivating factor" for a discharge, even though other factors also motivated the discharge.  42 U.S.C. § 2000e-2(m); *see Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 435-36 (8th Cir. 1998).  Similarly, the MHRA makes it an unfair employment practice to discharge an employee "because of . . . sex," and "sex" includes "pregnancy" and "childbirth."  Minn. Stat. §§ 363A.03, subd. 42, 363A.08, subd. 2.  The Supreme Court of Minnesota has interpreted the MHRA to impose liability for discrimination when pregnancy was a motivating factor in an employment decision, *see Anderson v. Hunter, Keith, Marshall & Co., Inc.*, 417 N.W.2d 619, 626-27 (Minn. 1988), and since 1991, we have said that sex discrimination claims under Title VII and the MHRA may be analyzed simultaneously.  *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir. 1998).

A plaintiff may survive a motion for summary judgment in two ways – by presenting "direct evidence" of discrimination, or by creating "the requisite inference of discrimination," including "sufficient evidence of pretext," under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). At the summary judgment stage, under the 1991 Act, the issue is "whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action." *Id.* at 735 (emphasis in original). If so, then "the presence of additional legitimate motives will not entitle the defendant to summary judgment." *Id.*

Roberts frames her argument in terms of the *McDonnell Douglas* paradigm, and argues that there is sufficient evidence to generate a dispute for trial concerning whether Park Nicollet's explanation that she was terminated for tardiness is a pretext for discrimination based on her pregnancy. We think the facts, viewed in the light most favorable to the plaintiff, demonstrate that there is a genuine dispute for trial concerning whether Park Nicollet's claim that the termination was motivated solely by Roberts's record of tardiness is pretextual, and whether Roberts's pregnancy was a motivating factor in the employment decision.

The most significant evidence in support of the claim are alleged statements of Lewis on January 10 and 12, 2005. According to Roberts's account, when she informed Lewis of the pregnancy on January 10, Lewis sighed and asked Roberts, "What are you going to do about the pregnancy; are you going to keep it?" A reasonable jury could infer that Lewis's sigh, together with the question, amounted to an expression of frustration by Lewis that Roberts had become pregnant, and an indication that a decision by Roberts to continue the pregnancy would be disfavored. Roberts further testified that when Lewis met with her on January 12, Lewis was "really curious" about Roberts's pending workers compensation claim for her arm injury, and was "really wondering about the pregnancy." (Roberts App. 35). Roberts

said that after discussing those matters, Lewis stated that Roberts had been late to work a couple of days, and that "because of all this" or "because of everything," Roberts would be terminated. (*Id.*). Roberts also alleges that Lewis stated that "with all the problems" that Roberts might be having soon, the termination was "probably the best decision." (*Id.* at 34). Roberts testified that she understood Lewis's statements to mean that the workers' compensation claim, the pregnancy, and the tardiness all were factors in the decision to terminate her employment. If Roberts's account is believed, we think a reasonable jury could make that same inference.

Given Lewis's role as a key decisionmaker in the employment action, her alleged statements to Roberts on these two dates, taken in the light most favorable to Roberts, may fairly be considered direct evidence that pregnancy was a motivating factor in the employment decision, sufficient in and of themselves to defeat a motion for summary judgment. Direct evidence for these purposes includes evidence of "remarks of the employer that reflect a discriminatory attitude," as well as "comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions." *EEOC v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir. 2002) (internal quotations and ellipses omitted). Although Roberts elected not to argue the case on a direct evidence theory, Lewis's alleged statements also provide an independent basis on which a reasonable jury could find that Park Nicollet's explanation for the employment action was pretextual, and that pregnancy was a motivating factor in the employment decision. *See Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 728 (8th Cir. 1992).

In addition to the direct statements by Lewis, there are questions concerning the credibility of Park Nicollet's explanation for the termination. When Lewis advised Roberts of the termination, Lewis cited the suspension and warning of November 29, followed by tardiness on December 6, December 20, and January 11. (Roberts App. 116). After considering Roberts's grievance, employee relations manager Nordby relied on the same three post-suspension dates in confirming the termination. (*Id.* at

131). There is evidence, however, that both Lewis and Nordby understood, prior to their respective communications with Roberts, that the tardiness on December 20 had been excused due to a snowstorm. (*Id*. at 116). Although Park Nicollet now asserts that the late arrival on December 20 was not held against Roberts's attendance record, the written documentation is to the contrary, and a factfinder may deem the conflicting evidence probative on the question whether the employer's asserted reasons for the termination were true.

This is not to say that we think a jury necessarily would find that Park Nicollet was motivated by Roberts's pregnancy. There is no question that Roberts compiled a problematic attendance record, and an employee's chronic tardiness surely is a legitimate reason for adverse action. Roberts was warned that even one additional late arrival after November 29 could result in termination, and there may be innocuous reasons for the employer's mistaken inclusion of the December 20 incident in the termination discussion and letter. There are also substantial credibility disputes concerning whether Roberts even notified Lewis of the pregnancy before Lewis decided to fire her, and whether Lewis made the remarks cited by Roberts as evidence of a discriminatory attitude. For her part, Lewis strongly denies the allegations, attests that she is "Catholic and Prolife," and asserts that she would not even think to raise a question with Roberts about whether she would "keep the baby." (Roberts App. 81). There is also evidence that Lewis sought to terminate Roberts on December 20, (*id*. at 116), thus suggesting that her legitimate motivation pre-existed any knowledge of Roberts's pregnancy, and perhaps bolstering Park Nicollet's contention that the termination decision was not infected by an impermissible motive. But these factual disputes cannot be resolved on a motion for summary judgment, and we conclude that the evidence discussed above is substantial enough to create a genuine dispute for trial.

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings.

_____