Amy ELAM, Plaintiff,

v.

REGIONS FINANCIAL CORPORATION; Regions Financial (DE), Inc.; Roxanne Rutherford; and Carol Knopic, Defendants.

No. 4:07–cv–00167–JEG.

United States District Court, S.D. Iowa, Central Division.

March 25, 2009.

Bruce H. Stoltze, Stoltze & Updegraff PC, Des Moines, IA, for Plaintiff.

Jaki K. Samuelson, Whitfield & Eddy PLC, Des Moines, IA, for Defendants.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment, which Plaintiff resists. The matter came on for hearing on November 12, 2008. Plaintiff was represented by Eric Updegraff. Defendants were represented by Jaki Samuelson. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

The following facts are either not in dispute or viewed in the light most favorable to the nonmoving party.

On July 16, 2005, Plaintiff Amy Elam (Elam) began working as a teller for Defendant Regions Financial Corporation (Regions) at its West Des Moines, Iowa, branch (WDM branch). The WDM branch created this teller position while Roxanne Rutherford (Rutherford), the WDM branch teller supervisor, was on temporary assignment converting Regions' data processing systems. While not available for all teller duties herself, Rutherford was a supervisor for Elam. Shortly after Elam began working at Regions, she started getting sick at work. Rutherford suggested that Elam visit a doctor. Elam visited her doctor on July 23, 2005, and was advised that she was pregnant. Elam presented Rutherford with a doctor's note indicating that she was pregnant, that she should be excused as necessary due to sickness, and that she should be allowed to have a beverage at her work station. Regions complied with all of the doctor's recommendations, allowing Elam to take time off as needed without pay if she became sick and permitting her to have a beverage at her work station.

On July 25, 2005, Elam was sent to Regions' Indianola, Iowa, branch for teller training. On July 26, 2005, Rutherford called Gloria Larkins (Larkins), a member of Regions' human resources department, and told Larkins that Elam had been sick for a couple days and that Elam revealed that she was pregnant. Rutherford was training another new associate together with Elam, which created a concern whether Rutherford would be able to simultaneously train both associates with the interruptions from Elam's illness. On July 27, 2005, Larkins called Rutherford and recommended that Elam needed to get a doctor's note detailing what arrangements could be made to accommodate Elam's morning sickness. Larkins also told Rutherford that Elam would remain eligible for full-time benefits provided that Elam worked thirty hours per week. Larkins suggested a possible accommodation that Elam could come in later in the day because of the morning sickness for at least a couple of weeks.

On August 15, 2005, Elam returned to the West Des Moines branch after she completed her teller training at the Indianola branch. Regions allowed Elam to have a beverage available at her work station at both the West Des Moines and Indianola branches. Despite these accommodations, Elam's morning sickness continued, and she estimated that she left her work station an average of four to five times per morning. On one occasion Elam left her work station during a transaction with a customer with a bout of her morning sickness. When Elam would become ill, there was always at least one teller available to help customers. Elam only stayed away from work when she was so ill that Rutherford or Carol Knopic (Knopic), the West Des Moines branch manager and Elam's supervisor along with Rutherford, required her to leave work. On August 23, 2005, Elam became extremely nauseated due to dehydration, and Knopic sent Elam home with Elam returning to work on August 26, 2005. Rutherford requested that Elam visit a medical doctor to determine what additional accommodations Regions could make to allow Elam to perform her teller responsibilities. Elam never provided any more information from her doctor.

On September 15, 2005, Knopic wrote an e-mail to Richard Tyler (Tyler), Regions' human resources representative, discussing the "19 year old (*pregnant girl*) teller that I am having problems with...." Pl. SUF ¶ 81, Pl. App. 11 (boldface in original). Knopic also indicated that she wanted to know if there was a way the WDM branch could discharge Elam based on Knopic's perception of Elam's poor job performance at Regions. Tyler replied that Knopic should prepare a termination

letter citing specific instances of Elam's substandard performance that did not meet with the supervisors' expectations for the teller position. Tyler informed Knopic, however, that he would not approve Elam's termination until he made an evaluation of Knopic's specific reasons supporting Elam's discharge because he had "to be sure that our justification will holdup due to the fact that she is pregnant." Pl. SUF ¶ 93, Pl. App. 12. After reviewing the details concerning Elam's poor performance, the Regions' human resources department approved the discharge, and Regions terminated Elam's employment.

Knopic and Rutherford listed several problems with Elam's work. Elam admits that on at least one occasion she left the cash drawer unlocked and on the counter and sometimes sat at her teller station with her head down on the counter. On August 18, 2005, Knopic counseled Elam and gave her a "memorandum of understanding" addressing several items of inadequate performance, including using her cell phone while on duty, failing to secure her cash drawers when she left her station, and leaving cash unattended on the counter. On August 23, 2005, Regions issued Elam a written warning for frequent absences from her teller station and leaving abruptly while waiting on customers, evidencing a "[l]ack of being able to perform duties required to fulfill job requirements due to having to go to the bathroom several times a day getting sick." Def. SUF ¶ 46, Def. App. 74–76. That same day, Knopic reiterated that Elam had the option of starting work later in the day after her nausea subsided, without pay for time missed. Elam declined this option and continued to report to work and continued to have episodes of nausea. If Elam elected to come in later in the morning to manage her morning sickness, then Elam would not be able to work forty hours per week. However, to qualify for full-time benefits, Elam only needed to work thirty hours per week, which would have allowed her to report to work at 10:00 a.m. after her morning sickness subsided. Knopic was concerned about losing other employees, including tellers Matthew Bean (Bean) and Amber Showers (Showers), who had expressed their frustration with Elam's inability to perform her job responsibilities.[1] On September 14, 2005, Elam was late for a mandatory meeting and did not actively participate in the meeting once she arrived, answering only one of fifty questions relating to a new data system. On September 16, 2005, Rutherford served Elam a termination notice, while summarizing the previous warning letters and indicating a number of additional infractions that Rutherford believed warranted Elam's termination.

Regions' discrimination and harassment policies did not specifically discuss pregnancy discrimination. Elam was aware of Regions' policies and had access to them online. Regions' policies set forth the procedures for filing harassment complaints, which Elam did not pursue.

Regions also had a progressive discipline policy that stated, "Regions wants to give you notice and an opportunity to correct improper conduct or substandard performance when it is appropriate to do so." Pl.

---

**1.** While the parties dispute whether Regions impermissibly considered pregnancy in terminating Elam, Knopic stated that Bean and Showers told Knopic that they were "extremely frustrated with having to work with someone that they have to continue to keep covering for and explaining everything to over and over again because they were hoping to have somebody that would be able to be self-sufficient." Def. App. 142. The Court considers this testimony only to the extent that it describes Knopic's belief that other employees were frustrated. Bean's and Showers' written affidavits corroborate Knopic's allegation that Bean and Showers were frustrated with Elam's performance as a teller.

SUF ¶ 100, Pl. App. 22. The three steps in the progressive discipline policy were (1) giving the employee a "memorandum of understanding," (2) giving the employee a written warning, and (3) finally terminating the employee. The policy states that "Regions reserves the right to skip any of these steps should Regions decide the conduct or performance warrant it." Pl. SUF ¶ 100, Pl. App. 22. Knopic used the progressive discipline policy when she disciplined Elam. Regions did not, however, give Elam the opportunity to correct the infraction of being late for the mandatory conversion meeting held on September 14, 2005. On September 16, 2005, Regions terminated Elam's employment.

Elam filed a complaint with the Iowa Civil Rights Commission (ICRC) and obtained a right to sue letter from the ICRC on January 25, 2007. Elam subsequently filed this action, alleging pregnancy discrimination under the Pregnancy Discrimination Act (PDA), see 42 U.S.C. § 2000e(k) (Count I); Title VII of the Civil Rights Act of 1964 (Title VII), see 42 U.S.C. § 2000e (Count II); and the Iowa Civil Rights Act (ICRA), see Iowa Code § 216.6 (Count III). Defendants filed this Motion for Summary Judgment on all counts of Elam's complaint, arguing no genuine issues of material fact remain for trial. Elam resists.[2]

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In consider-ing a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Thomas v. Corwin,* 483 F.3d 516, 526–27 (8th Cir.2007). Rather, the Court focuses "on whether a genuine issue of material fact exists for trial—an issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." *Morris v. City of Chillicothe,* 512 F.3d 1013, 1018 (8th Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). While it is common to recognize that "[s]ummary judgment should seldom be granted in discrimination cases," *Bassett v. City of Minneapolis,* 211 F.3d 1097, 1099 (8th Cir.2000), the "plaintiff's evidence must be sufficient to raise a genuine issue of material fact regarding defendant's reason for the employment action taken." *Reich v. Hoy Shoe Co., Inc.,* 32 F.3d 361, 365 (8th Cir.1994); *see also Berg v. Norand Corp.,* 169 F.3d 1140, 1144 (8th Cir.1999) ("There is no 'discrimination case exception' to the application of Fed. R.Civ.P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial.").

The party seeking summary judgment initially bears the burden of demonstrating the absence of any genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party satisfies its burden, the nonmoving party

---

**2.** Elam admits "the Court may dismiss any Title VII causes of action against Knopic and Rutherford in their individual capacity." Pl. Resist. to Def. Mot. for Summ. J. ¶ 4. Even though Elam argues the ICRA applies to the employer's supervisor employees, the Iowa Supreme Court has adopted the Eighth Circuit's interpretation of the federal PDA in interpreting the ICRA. *See Atwood v. City of Des Moines,* 485 N.W.2d 657, 660 (Iowa 1992).

must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "The mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. The substantive law determines what facts are material; "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Menz v. New Holland N. Am., Inc.,* 507 F.3d 1107, 1110 (8th Cir.2007) (quoting *Thomas,* 483 F.3d at 527.)[3]

### B. Pregnancy Discrimination Claims
#### 1. Federal PDA Statute

■ "The Pregnancy Discrimination Act amended Title VII to provide that discrimination 'on the basis of pregnancy' is a form of sex discrimination." *Fjelsta v. Zogg Dermatology, PLC,* 488 F.3d 804, 809 (8th Cir.2007) (quoting 42 U.S.C. §§ 2000e(k), 2000e–2(a)(1)). The ICRA similarly prohibits such conduct. *See* Iowa Code § 216.6(2)(a) ("A written or unwritten employment policy or practice which excludes from employment applicants or

employees because of the employee's pregnancy is a prima facie violation of this chapter."). "Thus, to prevail on her pregnancy discrimination claim, [the plaintiff has] the burden to show that she was treated differently because of her pregnancy or a pregnancy-related condition." *Deneen v. Nw. Airlines, Inc.,* 132 F.3d 431, 435 (8th Cir.1998) (internal quotation omitted). The PDA requires the employer to ignore an employee's pregnancy, but not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees, in which event it would not be ignoring pregnancy at all. *Adams v. Nolan,* 962 F.2d 791, 795–96 (8th Cir.1992). "The PDA does not create substantive rights to preferential treatment. On the contrary, the PDA allows employers [to] treat pregnant women as badly as they treat similarly affected but nonpregnant employees. The opposite, however, is also true—employers must treat pregnant women as well as they treat similarly affected employees." *Deneen,* 132 F.3d at 436–37 (internal quotations and citations omitted).

#### 2. Standard of Proof

■ In employment discrimination cases, "[a] plaintiff may survive a motion for summary judgment in two ways—by presenting 'direct evidence' of discrimination, or by creating 'the requisite inference of discrimination,' including 'sufficient evidence of pretext,' under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Roberts v. Park Nicollet Health Servs.,* 528 F.3d 1123, 1127 (8th Cir.2008) (citing *Griffith v.*

---

**3.** The Court analyzes Elam's Title VII and ICRA claims under the PDA framework. *See Johnson v. Univ. of Iowa,* 431 F.3d 325, 332 (8th Cir.2005) (citing *Henthorn v. Capitol Commc'ns, Inc.,* 359 F.3d 1021, 1024 n. 2 (8th Cir.2004)); *Morris v. Conagra Foods, Inc.,* 435

F.Supp.2d 887, 905 (N.D.Iowa 2005) ("It is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA.").

*City of Des Moines,* 387 F.3d 733, 736 (8th Cir.2004)). Defendants argue that Elam cannot satisfy either burden of proof to support a PDA claim, to which Elam resists.

### a. Direct Evidence

■ Elam argues that there are several pieces of direct evidence that preclude the Court from granting Defendants' summary judgment motion. The employee may produce direct evidence of discrimination, which is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Russell v. City of Kansas City, Mo.,* 414 F.3d 863, 866 (8th Cir.2005). "If there is direct evidence of [pregnancy] discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor." *Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1046 (8th Cir.2005) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). The employee "may proceed under *Price Waterhouse* if she produces direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Kratzer,* 398 F.3d at 1045–46.

■ "Direct evidence ... includes evidence of 'remarks of the employer that reflect a discriminatory attitude,' as well as 'comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions.'" *Rob-*

*erts,* 528 F.3d at 1127 (quoting *EEOC v. Liberal R–II Sch. Dist.,* 314 F.3d 920, 923 (8th Cir.2002)); *see also Gross v. FBL Fin. Servs., Inc.,* 526 F.3d 356, 359 (8th Cir. 2008), *cert. granted,* —— U.S. ——, 129 S.Ct. 680, 172 L.Ed.2d 649 (2008) (" 'Direct evidence' for these purposes is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action.") (quoting *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir.1997)).[4] " '[D]irect evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.' " *Browning v. President Riverboat Casino–Mo., Inc.,* 139 F.3d 631, 635 (8th Cir.1998) (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775).

■ Elam argues four different pieces of evidence constitute direct evidence under the PDA. First, Larkins' summarized notes of the telephone conversation between Larkins and Rutherford on June 26, 2005, stating, "[Rutherford] has a new associate that she had to send home sick last week a couple of times. Associate was sick again on Monday. Tuesday the associate found out she is pregnant and is now having morning sickness. What can they do? She is training with another new associate and one mentor is trying to train them." Pl. App. 2. Elam argues that the discussion of "morning sickness," which is a pregnancy-related symptom, and use of the phrase "what can they do," implying that Rutherford had already made up her mind to terminate Elam, constitutes direct evidence of pregnancy discrimination.

---

4. *Gross v. FBL Fin. Servs., Inc.,* is set for oral argument before the Supreme Court on March 31, 2009.

Reference to circumstances describing a protected class may illustrate prohibited discriminatory intent, which the law discourages, but may also be a necessary communication between supervisors and human resources personnel in an effort to assure employment decisions are not made on an improper basis, which the law encourages. Therefore context is important. Merely referring to a protected status "without a reflection of bias does not create a genuine issue of material fact on discriminatory intent." *Flowers v. City of Minneapolis*, 558 F.3d 794, 799 (8th Cir.2009). "[D]irect evidence should 'prove the particular fact in question without reliance upon inference or presumption.'" *Lim v. Trs. of Ind. Univ.*, 297 F.3d 575, 580 (7th Cir.2002) (quoting *Markel v. Bd. of Regents of the Univ. of Wis.*, 276 F.3d 906, 910 (7th Cir.2002)); *see also McCullough v. Univ. of Ark.*, 559 F.3d 855 (8th Cir.2009) ("Direct evidence provides a strong causal link between the alleged discriminatory bias and the adverse employment decision. It most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias.") (internal citations omitted); *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 725 (8th Cir.2001) ("Making this comment into evidence of age animus requires an inference, and the comment therefore does not directly reflect an attitude of discrimination based on age."). While Elam asserts by her statement that Rutherford *could* have been implying that "what can they could do" indicates a Regions desire to terminate Elam before she was eligible for benefits, under *Lim* any inference is too much. There are a number of inferences that *could* be drawn; however, if the Court is required to speculate as to the statement's meaning, by definition, it does not constitute direct evidence. *Erickson*, 271 F.3d at 718, 725.

Second, Elam argues that Larkins' summary of her telephone conversation with Rutherford on July 27, 2005, constitutes direct evidence because therein Larkins "suggested that [Elam] needed accommodations [for her morning sickness and] that the doctor needed to make recommendations. [Larkins] explained that as long as [Elam] worked 30 hours a week she would be eligible for full-time benefits. [Larkins and Rutherford] discussed that maybe [Elam] needed to come in later because of the morning sickness for a couple of weeks." Pl. App. 1. Elam argues that Rutherford and Knopic disciplined Elam with the intention of getting Elam to work less than thirty hours per week, making her ineligible for full-time benefits that included personal time off and pregnancy leave. However, Elam admits this conversation is only "circumstantial evidence that strengthens the causal link between Elam's pregnancy and the adverse employment actions taken against her." Pl. Resp. to Def. Mot. for Summ. J. at 20. This summary does not constitute direct evidence of pregnancy discrimination that Knopic or Rutherford wanted Elam not to work mornings to disqualify her from full-time benefits. Rather, the evidence indicates that Larkins told Rutherford that Elam should obtain a doctor's note containing accommodations that would help manage Elam's morning sickness symptoms and that Elam would remain eligible for benefits provided Elam worked thirty hours each week. "Because [Elam] has failed to establish a causal link between management's statements and her termination," the Court concludes that Elam has not presented direct evidence of pregnancy discrimination. *Quick v. Wal–Mart Stores, Inc.*, 441 F.3d 606, 609 (8th Cir. 2006).

Third, Elam argues that the written warning Knopic issued on August 23, 2005, constitutes direct evidence of pregnancy discrimination. Specifically, the

written warning discussed Elam's "[l]ack of being able to perform duties required to fulfill job requirements due to having to go to the bathroom several times a day getting sick" and "[h]aving to leave for the bathroom while waiting on customers." Pl. App. 6. The written warning indicated that if Elam could not perform the duties required by her teller position, she would receive "[f]urther disciplinary action up to and including termination." Pl. App. 7. Elam argues that the written warning "clearly discipline[d] Elam for her morning sickness and pregnancy." Pl. Resp. to Def. Mot. for Summ. J. at 20. The Court disagrees.

The written warning did not criticize Elam's pregnancy; rather, the criticism was directed towards the fact that Elam reported to work when she was too ill to satisfactorily perform her job. Elam admits that she was absent an average of four to five times per day and on at least one occasion had to leave for the restroom eleven times. Elam admits on August 23, 2005, when Knopic issued the written warning, Elam was extremely nauseated due to dehydration and did not return to work until Friday, August 26, 2005. Regions had a legitimate nondiscriminatory objective in expecting its employees to not report for work when they were unable to perform their duties. The fact that Elam's illness could be attributed to her pregnancy does not transform this written warning based on a legitimate company policy into direct evidence of pregnancy discrimination. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir.2006) ("[Courts] have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee.").

Finally, Elam argues that the e-mail correspondence between Knopic and Tyler constitutes direct evidence. Specifically, Elam points to Knopic's description of Elam as the "19 year old (*pregnant girl*) teller that I am having problems with . . . ," when Knopic inquired that she "would like to know if anything can be done to let her go." Pl. SUF ¶ 81, Pl. App. 11 (boldface in original). Elam argues that referring to Elam as a "pregnant girl" in boldface is evidence of discrimination. As the Court previously noted, "[a] statement that refers to a protected status without reflecting bias is not direct evidence of discrimination," such as in the present case, where "the remark did not reflect a negative attitude toward pregnancy generally and in no way forecast how the employer would deal with the adverse situation if it arose." *Fjelsta*, 488 F.3d at 810; *see also Hervey v. County of Koochiching*, 527 F.3d 711, 720 (8th Cir.2008) ("[A] single comment that merely references gender is not sufficient to create a genuine issue of material fact of sex discrimination."). Knopic's e-mail contained a laundry list of complaints related to Elam's job performance, including using her cell phone during working hours, leaving her cash drawers unlocked while leaving cash on the counter and leaving the cash unattended, leaving her teller station excessively for bathroom breaks, speaking too softly with customers using the bank's drive-thru window, not greeting or smiling at the bank's customers appropriately, keeping her head down on the counter, having a sub-standard performance on an internal teller examination, and arriving late to a mandatory meeting. This communication reminds human resources personnel that this employee issue not only involved the various performance issues but must be evaluated with due regard to the employee's protected status under the law. In this context the reference to Elam's pregnancy essentially constitutes a stray remark because Knopic's e-mail discussed a myriad of other complaints related to Elam's performance and did not cast

Elam's pregnancy in a negative light. *Compare Fjelsta*, 488 F.3d at 810 (advising plaintiff that she "better take precautions so both you girls don't end up pregnant. We can't have both nurses gone at the same time" was not direct evidence of discrimination); *with Roberts*, 528 F.3d at 1128 (holding supervisor's question, "What are you going to do about the pregnancy; are you going to keep it?" while sighing, was direct evidence of discrimination); *see also Quick*, 441 F.3d at 609 (finding that a comment about the length of an employee's maternity leave was not direct evidence of pregnancy discrimination, when the comment was "in the context of a broader management meeting addressing a myriad of . . . issues").

 Elam also argues that the e-mail discussion between Knopic and Tyler regarding terminating Elam *because* she was pregnant is evidence that Elam was terminated because of her pregnancy. While conversations between a supervisor and a human resources department may constitute direct evidence of discrimination, it is the content of those conversations, and not the mere fact that those conversations occurred, that determines whether the communications constitute direct evidence. As the Eighth Circuit held in the context of age discrimination,

> [The plaintiff] argues that the record contains direct evidence of age discrimination and that the district court therefore erred in requiring him to establish a prima facie case. Viewed in the light most favorable to [the plaintiff], the record reveals that when [the supervisor] informed [the plaintiff] that he would probably be terminated, [the plaintiff] stated that he believed that his termination would violate the ADEA and asked [the supervisor] to investigate the issue. [The supervisor] agreed to do so. After speaking with legal counsel, [the supervisor] told [the plaintiff] that he

> was concerned that [the plaintiff's] termination might violate the ADEA but that counsel had ultimately assured him that it would not. [The plaintiff] contends that this statement by [the supervisor] is direct evidence of age discrimination.
>
> We disagree, for [the supervisor's] expression of concern over a possible age discrimination claim can only be reasonably read as a nonincriminatory response to [the plaintiff's] request that [the supervisor] investigate the possibility that such a claim might validly exist. It would be a foolhardy supervisor indeed who, however well-documented and irrefutably established a termination decision might be, would not have some concern over possible litigation arising out of the termination of an age-protected employee. An expression of concern in these circumstances should not be equated with an admission of age-related animus on the part of [the company], but rather should be regarded as a natural reaction to the ever-present threat of litigation attendant upon terminating an age-protected employee. To elevate [the supervisor's] response to [the plaintiff's] statements and request for investigation would be to place an unwarranted gloss of self-incrimination upon an innocent, well-meaning remark. We view [the supervisor's] response as the functional equivalent of a stray remark that we have said does not constitute evidence of discriminatory animus. *See Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir.1993); *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991).

*Bashara v. Black Hills Corp.*, 26 F.3d 820, 823–24 (8th Cir.1994). The distinction from *Bashara v. Black Hills Corp.* is that the employee solicited the supervisor to make an inquiry based on his protected status, whereas here Knopic inquired

about a potential PDA lawsuit. This is a distinction without a difference. It would be contrary to public policy for a manager's request for advice and prior approval of employment actions related to an employee who is a member of a protected class to constitute evidence of a discriminatory motive. *Id.*

Accordingly, under the applicable legal standards, none of the evidence Elam sets forth constitutes direct evidence of pregnancy discrimination supporting her PDA claim.

## b. Burden-shifting Analysis

 If the employee cannot produce direct evidence of discrimination, in order to defeat a motion for summary judgment the plaintiff must present a prima facie case of discrimination under the *McDonnell Douglas* framework. The plaintiff must establish a prima facie case of discrimination by presenting evidence which demonstrates "(1) she was a member of a protected group; (2) she was qualified for her position; and (3) she was discharged under circumstances giving rise to an inference of discrimination." *Bergstrom–Ek v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir.1998). If the plaintiff establishes a prima facie case of discrimination, "the employer may advance a legitimate, nondiscriminatory reason for the employee's discharge. The burden of production then returns to the plaintiff to show that the employer's reason is a pretext for pregnancy discrimination." *Quick*, 441 F.3d at 610 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817 (internal citation omitted)).

Elam satisfies the first element of a prima facie case because Elam was pregnant at the time Regions took adverse action against her. Regions, however, challenges whether Elam can generate genuine issues of material fact on the other two elements of her prima facie case of pregnancy discrimination, "qualification"

and "inference of discrimination." Elam also challenges whether Regions' proffered reason for terminating was a pretext for pregnancy discrimination.

### (1) Qualifications

 Regions challenges that Elam was not qualified for her position and therefore failed to establish or generate genuine issues of material fact on the "qualification" element of her prima facie case. *See Bergstrom–Ek*, 153 F.3d at 857. "At the prima facie stage of a sex discrimination case, the employee must demonstrate objective qualifications. An employee must show that her qualifications are equivalent to the minimum objective criteria. The threshold criteria are the plaintiff's physical ability, education, experience in the relevant industry, and the required general skills. These qualifications are demonstrated when the employee actually performs her job at a level that [meets her] employer's legitimate expectations." *Kratzer*, 398 F.3d at 1046–47 (internal citations and quotations omitted).

 Fundamentally, being present to perform one's job is an essential function. *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1127 (8th Cir.2000) (concluding that because of plaintiff's habitual tardiness, she "failed to comply with the [employer's] requirement that all teachers be present in their classrooms when their students arrived at school, thereby leaving her students unattended and unsupervised on a number of occasions" and therefore did not meet the employer's qualifications). Regions asserts that Elam's average of four to five absences throughout the morning from her teller station rendered Elam unqualified for her job. Regions further asserts that because it offered Elam time off and because Elam declined to avail herself to the offer, Elam was not immune from Regions' performance expectations, including the expectation that she be present at her

teller station to perform teller duties as needed and to work on her training when she had no customers needing assistance. *See Nesser v. Trans World Airlines, Inc.,* 160 F.3d 442, 445 (8th Cir.1998) (holding that attendance is a necessary job function and that the plaintiff, who was unable to come to work on a regular basis, could not establish that he could perform the essential functions of his job); *Gorman v. Wells Mfg. Corp.,* 209 F.Supp.2d 970, 980 (S.D.Iowa 2002) (granting summary judgment on the plaintiff's ADA and PDA claims because excessive absenteeism rendered plaintiff "unqualified"). While periodic absences during the day are distinguishable from not showing up for work at all, an employer has a legitimate expectation that an employee's attendance will conform to the employer's reasonable expectations for her attendance. *Nesser,* 160 F.3d at 445 ("[The defendant] considered attendance to be an 'essential function' of each of [the plaintiff's] positions with [the defendant]."). Regions placed a premium on their bank tellers' ability to handle customers quickly and promptly, which Regions demonstrated by creating the second teller position for which Elam was hired, to fill the void created by Rutherford's data conversion assignment.

■ Additionally, Regions is best situated to determine their own staffing needs in their particular business environment, and the Court must defer to the employer's judgment. *Johnson v. Ready Mixed Concrete Co.,* 424 F.3d 806, 812 (8th Cir. 2005) ("[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. One reason we emphasize this point is that a number of plaintiffs present a sympathetic situation in which the employer's judgment in imposing discipline may appear poor or erroneous to outsiders."). Regions informed Elam of their expectations when Knopic issued the written warning to Elam that informed Elam that if she continued

to not "perform the duties required by her teller position," then Knopic would recommend "[f]urther disciplinary action up to and including termination." Pl. App. 7.

Besides Elam's frequent morning breaks, Regions had other concerns relating to Elam's ability to perform her teller duties. On August 18, 2005, Knopic counseled Elam and gave her a "memorandum of understanding" addressing several items of inadequate performance, including using her cell phone while on duty, failing to secure her cash drawers when she left her station, and leaving cash unattended on the counter. On August 23, 2005, Regions issued a written warning to Elam for frequent absences from her teller station and leaving abruptly while waiting on customers. On September 16, 2005, Rutherford terminated Elam's employment, citing many nonpregnancy-related job performance issues. Elam herself admits that she left her teller station on an average of four to five times each morning, she once left the cash drawer unlocked and on the counter, she sometimes sat at her teller station with her head down on the counter, failed the tests designed to measure her understanding of her job responsibilities and still answered test questions incorrectly even after recording the correct answers, and arrived eight minutes late to a mandatory work-related meeting.

Granting all inferences in the light most favorable to Elam, the fact that Elam had seven months of previous teller experience at another bank does not address whether she was qualified to perform the specific teller duties under the business circumstances at Regions. Similarly, it is irrelevant that Regions believed that Elam was qualified when Regions hired Elam because the job performance complaints relate to employee conduct that occurred after Elam began her employment at Regions. Accordingly, Elam has provided no evidence sufficient to persuade a reason-

able jury that Elam was qualified for her teller position based on Regions' criteria. Therefore, Elam has not presented a prima facie case of pregnancy discrimination required under the *McDonnell Douglas* framework.

### (2) Pretext

If Elam had established a prima facie case of pregnancy discrimination, she still failed to produce sufficient evidence that Regions' proffered reason for termination was pretextual. *See Buettner v. Arch Coal Sales Co.,* 216 F.3d 707, 717 (8th Cir.2000) ("For a plaintiff to survive summary judgment, she must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions."). Regions has satisfied its burden of production on the second part of the *McDonnell Douglas* burden-shifting framework that "the employer may advance a legitimate, nondiscriminatory reason for the employee's discharge." Regions has provided a lengthy list of legitimate, nondiscriminatory reasons for Elam's discharge, including, among other things, Elam's frequent absences from her teller station, leaving the cash drawer unattended, slouching at her teller station, and arriving late to Regions' meetings. *Quick,* 441 F.3d at 610. Once Regions has met its burden of production, the burden shifts to Elam to establish Regions' proffered reason was pretextual.

> To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason. This burden will not be met by simply showing that the reason advanced by the employer was

false; rather, [the plaintiff] must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations. Specifically, the plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

*Wilking v. County of Ramsey,* 153 F.3d 869, 874 (8th Cir.1998) (internal quotations and citations omitted). The relevant inquiry is whether Knopic and Rutherford reasonably believed that Elam was not qualified to perform her job, and they therefore properly exercised their discretion in terminating Elam on that basis. *See McNary v. Schreiber Foods, Inc.,* 535 F.3d 765, 769 (8th Cir.2008) ("The relevant inquiry is not whether [the employee] actually violated the company policy nor is it whether he was actually sleeping. 'A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination.'") (quoting *Twymon,* 462 F.3d at 935).

The complaints Rutherford and Knopic received from other tellers at the WDM branch regarding Elam's performance and how Elam's performance interfered with other tellers' job performance corroborates Knopic and Rutherford's decision to terminate Elam. These complaints conflict with Elam's argument that she did not repeat specific instances of misconduct or that Regions inconsistently applied its progressive discipline policy, supporting the ultimate employment decision even if the complaints were later determined to be inaccurate. Elam has produced no evidence that Knopic or Rutherford were aware of similar misconduct committed by other employees.[5] *See*

---

5. Elam argues that a nonpregnant employee who reported to Rutherford, Amy Conklin (Conklin), was treated more favorably than

Elam in that she was disciplined for tardiness numerous times before being fired.

*Clearwater*, 231 F.3d at 1127 (granting summary judgment when there was no record evidence detailing tardiness of others or that the employer was aware of their tardiness). Further, the record does not reflect that Elam's co-workers suffered from the same work-related problems as Elam. While Elam argues she was unfairly targeted compared to other employees, she was not "similarly situated" to Bean or Showers because they had been employees with Regions for a longer period of time. If Elam was watched more closely, Regions' explanation that Elam was making multiple errors, generating complaints from her co-workers, and her supervisors had observed Elam violating company policies all support Elam's supervisors potentially paying greater attention to Elam's job performance. Accordingly, Elam's circumstances were not similar to longer-term employees whose competence and acceptable performance had been established. *See Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir.2006) ("We have equated the phrase similarly situated in all relevant respects with the statement that employees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways.") (internal quotations omitted).

The Court does not substitute its judgment for that of the employer with respect to whether conduct is severe enough to warrant discipline. *Rodgers v. U.S. Bank,*

*N.A.*, 417 F.3d 845, 854–55 (8th Cir.2005). It is up to the employer to determine the type of conduct that is unacceptable. *King v. Hardesty*, 517 F.3d 1049, 1063 (8th Cir.2008). Provided that Regions did not warn other employees before terminating its employees, Regions had no obligation to warn Elam before instituting disciplinary measures. *See Riser*, 458 F.3d at 821 (holding that "an employer's failure to inform an employee of what is expected of [her] is not evidence of discriminatory animus"). So long as Regions acted based on a genuine belief that Elam's conduct warranted disciplinary action—and Elam offers no evidence that it did not—Elam's disagreement with the employer's decision is not evidence of a discriminatory motive. *Rodgers*, 417 F.3d at 855. Accordingly, Elam has not "prove[d] by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The Court must conclude Elam cannot establish a prima facie case of pregnancy discrimination under the PDA using the *McDonnell Douglas* burden-shifting framework to deny Defendants' summary judgment motion. Even assuming *arguendo* that threshold has been met, Elam cannot sustain her burden of proof that Elam's proffered reasons were pretextual to justify Elam's termination.

---

This argument does not, however, establish discriminatory treatment of Elam. "Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that [the plaintiff] and the disparately treated [employees] were similarly situated in all relevant respects." *McNary*, 535 F.3d at 770. Elam cannot establish that Conklin's performance history was similar to Elam's "in all relevant respects" as is required in order to draw an inference of discrimination from dissimilar treatment. Elam left her tell-

er station four to five times each morning; in contrast, Conklin was issued a written warning for excessive tardiness in reporting to work. Many of Elam's complaints related to her customer service and Elam's co-workers having to cover for Elam when she was absent or did not know how to process the transaction; in contrast, Conklin's non-tardiness infractions related to her inability to follow proper bank procedures in processing customer transactions.

## III. CONCLUSION

Viewing the evidence in the light most favorable to Elam, and in the absence of any genuine issues of material fact, Elam's PDA claims fail as a matter of law. Therefore, Defendants' Motion for Summary Judgment (Clerk's No. 18) must be **granted** as to all claims. Elam's case is hereby **dismissed.** The Clerk is directed to enter judgment for the Defendants and against the Plaintiff.

**IT IS SO ORDERED.**