In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 01-4295

DR. SOO-SIANG LIM,

*Plaintiff-Appellant,*

*v.*

THE TRUSTEES OF INDIANA UNIVERSITY
AND DR. DAVID BURR,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP99-419-C M/S—**Larry J. McKinney**, *Chief Judge.*

---

ARGUED MAY 30, 2002—DECIDED JULY 19, 2002

---

Before FLAUM, *Chief Judge*, and HARLINGTON WOOD, JR.,
and MANION, *Circuit Judges.*

FLAUM, *Chief Judge.* Dr. Soo-Siang Lim ("Lim") filed suit
against the Trustees of Indiana University and Dr. David
Burr, the Chairman of that school's medical anatomy de-
partment. According to Lim, Indiana University ("IU") en-
gaged in gender discrimination when it decided not to grant
her tenure. Furthermore, Lim alleged that Burr acted with
intent to deprive her of her civil rights in violation of 42
U.S.C. § 1983. After initial proceedings and discovery, the
district court granted summary judgment in favor of both
defendants. For the reasons stated below, we affirm the
decisions of the district court.

## I. BACKGROUND

In 1990, Lim was hired by the Department of Anatomy at the IU medical school in Indianapolis. At the time of Lim's hire, Burr was the chairman of the Anatomy Department. In his capacity as chairman, Burr assiduously attempted to attract Lim to IU's medical school,[1] such that he made several deviations from standard IU policy. For example, Burr offered Lim an entry position as an Associate (as opposed to Assistant) Professor, allowed her to commence her employment with IU two months later than he would have ordinarily required, and helped to award her laboratory almost $250,000 in start-up funds.

Under the terms of Lim's appointment, she would be employed for an initial three-year term, after which she would be reviewed annually, by a faculty committee, to see if she would be reappointed. Assuming that she would, in fact, be reviewed favorably, Lim's employment agreement provided that a final decision regarding her tenure would be made by late 1996.[2]

### IU Medical School's Policies Regarding Tenure

At IU's medical school, a candidate for tenure is reviewed for her proficiency in three principal areas: research, teaching, and service. In order to receive tenure, a faculty member must receive an "excellent" rating in one of these areas and at least a satisfactory rating in the remaining catego-

---

[1] Prior to her hire at IU, Lim was weighing offers from other schools in the Midwest.

[2] In March of 1993, Lim requested a one-year extension of her tenure decision deadline. As a result of this extension, her tenure probationary period was extended to June 30, 1998. This again assumed that she would be reviewed favorably and would receive annual renewal.

ries.[3] Candidates for tenure can, and often do, declare the area in which they believe that they are "excellent." Lim declared to Burr that she was "excellent" in the area of research.

When Burr became chairman of the Department of Anatomy in 1990, he implemented higher standards for those faculty members seeking tenure on the basis of their research. According to these standards, faculty members were expected, *inter alia*, to publish a minimum of 1 to 2 peer-reviewed research papers per year in good to outstanding quality journals. For at least half of these articles, tenure candidates had to have been listed as first or senior author.[4]

During the relevant time period, Anatomy Department faculty members who were on the tenure track were required to meet annually with the department chairman to discuss their goals in the areas of research, teaching and service. In addition, tenure track faculty members received an annual review conducted by the Department Primary Committee, which was composed of certain other faculty members from the Department of Anatomy. Tenure track faculty members also received a three-year review from the School of Medicine's Promotion and Tenure Committee.

The process that a candidate must undergo prior to receiving tenure is multi-tiered. First, a candidate must be recommended by the Department Primary Committee. Sec-

---

[3] In rare exceptions, tenure has been granted to faculty members who have not received an "excellent" rating in any category. However, in these cases, there must be a finding that the faculty member was near excellent in all three areas.

[4] Medical and scientific journals, which are heavily driven by research, often have numerous contributors. A first or senior author is generally presumed to have taken a more substantive role in the conducting of that research and the presentation of the results.

ond, the candidate has to be recommended by the chairman of the Department. Third, the candidate must undergo review by and receive a recommendation from the School of Medicine. Next, the candidate must be approved by the Dean of the School of Medicine. The fifth step entails a review from the University's committee on promotion and tenure. After that review, assuming that favorable recommendations have been given, the candidate must be approved by the Chancellor of the University and the Dean of Faculties. The employment of a tenure-track faculty member who is denied tenure is terminated at the end of his or her current appointment term.

### Lim's Tenure Process

In Lim's three year review, the Medical School's Committee voted 12-0 that she had been making "inadequate" progress toward promotion and tenure. The Dean of the School of Medicine forwarded Lim a copy of this review and instructed her to confer with the chairman of her department. During her probationary period and her subsequent reviews with Burr and the Department's Primary Committee, Lim was warned that she was not publishing at an acceptable rate. Indeed, when Lim ultimately submitted her candidacy for tenure in the summer of 1996, she had published only five peer-reviewed publications while at IU. Lim was only the senior author of one of these articles and the first author of none. Accordingly, the Department Primary Committee voted 4-0 against awarding Lim tenure; the School Committee voted 15-0 against awarding tenure; and the University Promotion and Tenure Committee voted 2 in favor of awarding tenure to Lim and 14 against. Likely as a result of these lopsided votes, on March 18, 1997, the University Chancellor and the Dean of Faculties informed Lim that her bid for tenure had been denied.

Lim filed an internal appeal of her tenure denial in June 1997. On appeal, the Department Primary Committee voted

3 to 2 in favor of granting tenure. Notwithstanding this vote, Burr continued to recommend against granting tenure to Lim due, in part, to her failure to meet departmental publishing and research standards. The Dean of the School of Medicine also recommended against tenure for Lim, after which time the Dean of Faculties denied her appeal. On December 9, 1998, the IU Faculty Board of Review also disposed of the grievance which Lim filed challenging her denial of tenure. According to that Board, "Dr. Lim received fair and equitable treatment in the tenure review process and . . . the University's decision to deny tenure was appropriate."

In February of 1998, shortly after the Faculty Board of Review disposed of her grievance, Lim filed an internal complaint against Burr and several other medical school faculty members with the IU Committee on Ethics in Research. According to Lim, Burr committed academic misconduct by depriving her of authorship credit on an abstract to which she contributed. A subcommittee investigated Lim's charge and found no credible evidence of academic misconduct.

On August 6, 1998, Kathleen Warfel, a Professor of Pathology and Laboratory Medicine at IU's School of Medicine, as well as the Director of the Office of Women for IU, wrote a letter to Myles Brand, the president of the University. In her letter, Warfel stated that she was "distressed at what seems likely to be a matter of gender discrimination in the tenure decision regarding Soo-Siang Lim of the Department of Anatomy." Brand responded to Warfel's letter on August 18, 1998, stating: "Your point, for example, of the tenure decision of Soo-Siang Li [sic], Anatomy, as an instance of continued unfairness in the treatment of women in the Medical School is well taken. (In this particular case, I was already aware of the problem, and I have previously made inquiries of the Dean. I have not had a response.) He is continuing to review the case." Brand further stated that

"the problems are so entrenched in the culture of the University, and especially in such disciplines as Medicine, change proves difficult to affect."

### *Lim's EEOC Charge and Complaint*

Lim filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 18, 1998, alleging that she was denied tenure because of her sex, race, or national origin. A right-to-sue letter was issued by the EEOC on March 17, 1999 and Lim filed suit the next day. In her initial complaint, Lim asserted two causes of action against IU for violation of Title IX, the Education Amendments of 1972, 20 U.S.C. §§ 1681-1693, *et seq.* and for common law breach of contract. Lim's complaint was later amended to include a cause of action for gender discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000, *et seq.* On December 10, 1999, Lim filed a second amended complaint reasserting multiple claims against IU and adding Burr as a defendant in his individual capacity. According to Lim, Burr violated section 1983 by depriving her of her rights to equal protection and retaliating against her for her exercise of her rights under the First Amendment of the Constitution.

On January 5, 2000, the district court granted IU's Motion for Partial Judgment on the Pleadings and dismissed Lim's Title IX claim against IU. On December 5, 2001, the district court entered summary judgment against Lim on all remaining counts. Lim has filed this appeal.

## II. DISCUSSION

Lim does not appeal the district court's disposition of her Title IX, retaliation and breach of contract claims against IU. Rather, she appeals the district court's grant of summary judgment with respect to her gender discrimination

claims against the University. As for Lim's section 1983 claims against Burr, we find that in making one perfunctory reference to their continued viabilty, Lim failed to preserve them for appellate review.

## A. *Gender Discrimination*

We review a lower court's grant of summary judgment *de novo*, viewing all the facts and drawing all reasonable inferences in favor of the nonmoving party. *See Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). When we exercise that standard of review and examine the facts that Lim proffers as evidence of gender discrimination, we agree with the district court's decision regarding summary judgment.

Lim argues that IU did not grant her tenure because of her gender. Title VII makes it unlawful for employers to terminate (or not promote) employees because of their gender. *See* 42 U.S.C. § 2000e-2(a)(1). A plaintiff seeking to prove unlawful gender discrimination may do so either by offering direct evidence of discrimination or by providing indirect evidence through the framework articulated by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Lim claims that the letter drafted by the President of IU, in which he acknowledges concern over Lim's tenure decision, can be seen an admission of gender discrimination and, accordingly, as direct evidence to prove her case. Lim's argument fails for two principal reasons. First and foremost, in his letter, Brand did not admit that Lim's denial of tenure was discriminatory. Rather, Brand expressed concern about Lim's tenure decision (rightly so, given that at the time of the letter, she had already filed an EEOC charge) and ordered a thorough investigation. Once this investigation was conducted and Brand received a report, he concluded that it was clear to him that "the decision to

deny tenure to Dr. Lim was correct and that there was no basis for Dr. Lim's allegations of discrimination." Second, even if Brand's comments "can be interpreted as an acknowledgment by the defendant . . . of its discriminatory intent in making the challenged decision," one possible interpretation of these comments is not enough to transform them into direct evidence of discrimination. *Appellants Br.* at 9. Indeed, direct evidence should "prove the particular fact in question *without reliance upon inference or presumption.*" *Markel v. Board of Regents of the Univ. of Wisconsin*, 276 F.3d 906, 910 (7th Cir. 2002) (emphasis in original). Absent substantial conjecture, the comments cited by Lim do not establish discriminatory intent. Therefore, we agree that the Brand letter is not an admission of discriminatory intent and should not be cited as direct evidence of gender discrimination.

Similarly, when we examine Lim's claim under the *McDonnell-Douglas* burden-shifting framework, we find that she failed to state a *prima facie* case of gender discrimination. Under *McDonnell-Douglas,* a plaintiff establishes a *prima facie* case of sex discrimination if she demonstrates, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) at the time of termination, she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. *See*, *e.g.*, *Markel*, 276 F.3d at 911.

When we examine the undisputed facts of this case, we find that Lim fails to satisfy the second element of the *McDonnell-Douglas* test—that she was meeting IU's legitimate requirements regarding research and publishing. Throughout the course of her appointment at IU, Lim was warned that she was not meeting the publication expectations established by the Department of Anatomy. Indeed, in

her critical third-year review, she was unanimously criticized by the Medical School's Promotion and Tenure Committee for failing to publish at an acceptable rate. In spite of this critique, Lim did not increase her rate of publication. Indeed, when she submitted her candidacy for tenure she had produced only five peer-reviewed publications since joining IU six years earlier—on none of which was she first author and on only one was she senior author. This rate of publication did not meet the standards set forth by the Department of Anatomy, which required the publication of at least one to two articles a year with senior or first authorship on at least half.

Perhaps aware of her lack of publishing, Lim has attempted to cure this defect in her case in many ways. Primarily, however, she argues that other professors (all of whom are male) with publishing records equal or inferior to hers, received tenure in spite of their apparent lack of qualifications. This argument cannot prevail. While Lim does cite male faculty members whose rate of publication was similar to her own, those individuals were granted tenure before Burr became chairman of the Department of Anatomy and implemented higher publishing standards.[5] Individuals who were examined for tenure under different (and more stringent) standards, several years before Lim was even a candidate for tenure, are not similarly situated. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (to be deemed similarly situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have "dealt with the same supervisor . . . [and have been] subject to the same standards . . ."). By even the most permissive of accounts, Lim did not meet the research and publishing criteria established by her Department. Accordingly, she failed to establish a prima facie case of employment discrimination.

---

[5] The remaining individuals cited by Lim all had met the departmental requirements established by Burr.

**B.** *Section 1983 Claims*

We may dispose of Lim's claims for relief against Burr under section 1983 with a measure of dispatch. Throughout the entirety of her opening brief, Lim makes one passing reference (in a footnote) to section 1983 and has no separate section devoted to her claims against Burr. Indeed, from our review of Lim's brief, it is far from clear whether she wishes to appeal the district court's rulings with respect to her section 1983 claims against Burr. Where Burr is mentioned in Lim's brief, it appears that she seeks to use his conduct to bolster her case under Title VII. When (as here) a party so inadequately and perfunctorily develops a claim on appeal, we will consider that claim or series of claims waived. *See Muhich v. Commissioner of the Internal Revenue Svc.*, 238 F.3d 860, 864 n.10 (7th Cir. 2001); *Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 593 (7th Cir. 1992).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the decisions of the district court.

A true Copy:

     Teste:

                                     _____
                                     *Clerk of the United States Court of*
                                        *Appeals for the Seventh Circuit*