In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3400

KEVIN T. SINGER,

*Plaintiff-Appellant*,

*v.*

RICHARD RAEMISCH,* PHILLIP KINGSTON,
BRUCE C. MURASKI, and MARC J. MASSIE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-C-1040—**J.P. Stadtmueller**, *Judge*.

ARGUED SEPTEMBER 18, 2009—DECIDED JANUARY 25, 2010

Before EASTERBROOK, *Chief Judge,* and WILLIAMS and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* After concluding that the popular
role-playing game Dungeons and Dragons ("D&D")

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Richard Raemisch, the current Secretary of the Wisconsin
Department of Corrections, is automatically substituted for
former Secretary Matthew J. Frank.

represented a threat to prison security, officials at Wisconsin's Waupun Correctional Institution took action to eradicate D&D within the prison's walls. Inmate Kevin T. Singer found himself on the front lines of Waupun's war on D&D when prison officials confiscated a large quantity of D&D-related publications from his cell. Singer sought relief from the prison's new regulations—and the return of his D&D materials—through the prison's complaint system, a pursuit which ultimately proved fruitless. Singer then brought this action against a variety of prison officials pursuant to 42 U.S.C. § 1983. He alleged that Waupun's confiscation of his D&D materials and imposition of a ban on D&D play violated his First Amendment right to free speech and his Fourteenth Amendment rights to due process and equal protection. The prison officials moved for summary judgment on all of Singer's claims, and the district court granted their motion in full. Singer appeals the grant of summary judgment with respect to his First Amendment claims, and we affirm.

## I. Background

Kevin T. Singer is an inmate at Wisconsin's Waupun Correctional Institution. He is also a devoted player of D&D, a fantasy role-playing game in which players collectively develop a story around characters whose personae they adopt. Singer has been a D&D enthusiast since childhood and over time has acquired numerous D&D-related publications. His enthusiasm for D&D is such that he has handwritten a ninety-six page manuscript

outlining the specific details of a "campaign setting" he developed for use in D&D gameplay.[1]

Singer's devotion to D&D was unwavering during his incarceration at Waupun. He frequently ordered D&D publications and game materials by mail and had them delivered to his cell. Singer was able to order and possess his D&D materials without incident from June 2002 until November 2004. This all changed on or about November 14, 2004, when Waupun's long-serving Disruptive Group Coordinator, Captain Bruce Muraski, received an anonymous letter from an inmate. The letter expressed concern that Singer and three other inmates were forming a D&D gang and were trying to recruit others to join by passing around their D&D publications and touting the "rush" they got from playing the game. Muraski, Waupun's expert on gang activity, decided to heed the letter's advice and "check into this gang before it gets out of hand."

On November 15, 2004, Muraski ordered Waupun staff to search the cells of the inmates named in the letter. The search of Singer's cell turned up twenty-one books, fourteen magazines, and Singer's handwritten D&D manu-

---

[1] A typical D&D game is made up of an "adventure," or single story that players develop as a group. A related series of games and adventures becomes a "campaign." The fictional locations in which the adventures and campaigns take place—ranging in size and complexity from cities to entire universes—are called "campaign settings." For more information about D&D and D&D gameplay, see Wizards of the Coast, What is D&D?, http://www.wizards.com/default.asp?x=dnd/whatisdnd (last visited Jan. 20, 2010).

script, all of which were confiscated. Muraski examined the confiscated materials and determined that they were all D&D related. In a December 6, 2004 letter to Singer, Muraski informed Singer that "inmates are not allowed to engage in or possess written material that details rules, codes, dogma of games/activities such as 'Dungeons and Dragons' because it promotes fantasy role playing, competitive hostility, violence, addictive escape behaviors, and possible gambling." This prohibition was later reiterated in a daily bulletin that was posted throughout the prison. It was also incorporated into a broader policy prohibiting inmates from engaging in all types of fantasy games.

On December 14, 2004, Singer and the three other inmates fingered in the anonymous letter to Muraski filed a complaint under Waupun's Inmate Complaint Review System. The complaint concerned the seizure of D&D materials from the inmates' cells. Waupun's inmate complaint examiner investigated the complaint and on December 23, 2004, issued a report recommending its dismissal. The complaint was dismissed shortly thereafter.

After the prison dismissed the internal complaint he had spearheaded, Singer lodged a pro se civil rights complaint in federal court pursuant to 42 U.S.C. § 1983. (He was eventually provided with counsel pursuant to 28 U.S.C. § 1915(e)(1).) He alleged that his free speech and due process rights were violated when Waupun officials confiscated his D&D materials and enacted a categorical ban against D&D. Singer named Muraski, several other Waupun officials, and the Secretary of the Wisconsin

Department of Corrections as defendants (collectively "prison officials"). Singer sought a panoply of relief from the court, including a declaratory judgment that his constitutional rights were violated and an injunction ordering the prison officials to return his confiscated publications.

Singer collected fifteen affidavits—from other inmates, his brother, and three role-playing game experts. He contends that the affidavits demonstrate that there is no connection between D&D and gang activity. Several of Singer's affiants indeed asserted the opposite: that D&D helps rehabilitate inmates and prevents them from joining gangs and engaging in other undesirable activities. The prison officials countered Singer's affidavit evidence by submitting an affidavit from Captain Bruce Muraski, who has spent nearly twenty years as Waupun's Disruptive Group Coordinator and Security Supervisor and belongs to both the Midwest Gang Investigators Association and the Great Lakes International Gang Investigators Coalition. Muraski also has extensive training in illicit groups ranging from nationwide street and prison gangs to small occult groups and has been certified as a gang specialist by the National Gang Crime Research Center. Muraski testified that it is his responsibility to "prevent the grouping of inmates into new gangs or other groups that are not organized to promote educational, social, cultural, religious, recreational, or other lawful leisure activities." He further testified that fantasy role-playing games like D&D have "been found to promote competitive hostility, violence, and addictive escape behavior, which can compromise not only the

inmate's rehabilitation and effects of positive program-ming, but endanger the public and jeopardize the safety and security of the institution."

The prison officials moved for summary judgment on all of Singer's claims. The district court granted the motion in full, but Singer limits his appeal to the foreclo-sure of his First Amendment claims. In its evaluation of those claims, the district court applied the four-factor test announced in *Turner v. Safley*, 482 U.S. 78 (1987). It con-cluded that Singer failed to demonstrate that there was a genuine issue of material fact as to whether the D&D policy was reasonably related to Waupun's legitimate penological interests of maintaining safety and security and curbing gang activity.

## II. Discussion

We review a district court's grant of summary judgment de novo. *E.g.*, *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009). In doing so, we construe all facts and reasonable inferences in favor of the nonmoving party. *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008). However, our favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)). Thus, to succeed on appeal, Singer "must do more than raise some metaphysical doubt as to the material facts; [he] must come forward with specific facts showing that there is a

genuine issue for trial.*" Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Singer argues that his First Amendment claim should have survived summary judgment for what he characterizes as two independent reasons. First, he contends that his fifteen affidavits undermined the prison officials' assertion that D&D promotes gang-related activity, thereby raising a critical fact issue rendering summary judgment inappropriate. Second, he argues that the prison officials are not entitled to summary judgment because the D&D ban does not satisfy the standard set out in *Turner*, 482 U.S. at 89, which requires prison regulations that impinge on inmates' constitutional rights to be "reasonably related" to the prison's penological interests. We will examine both of Singer's arguments, but we will do so in a single discussion of *Turner* because his first argument speaks directly to one *Turner* factor and his second comprises his challenges to the remaining three.

A good place to start is with a review of the test that lies at the heart of the district court's ruling. In *Turner*, the Supreme Court determined that prison regulations that restrict inmates' constitutional rights are nevertheless valid if they are reasonably related to legitimate penological interests. *Id.* It then enumerated four factors courts should consider when assessing the reasonableness of restrictive prison regulations:

> (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced;

(2) whether the inmates have alternative means of exercising the restricted right;

(3) whether and the extent to which accommodation of the asserted right will impact prison staff, inmates' liberty, and the allocation of limited prison resources; and

(4) whether the contested regulation is an "exaggerated response" to prison concerns and if there is a "ready alternative" that would accommodate inmates' rights.

*See id.* at 89-91. The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts. *See id.* at 89-90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."); *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) ("Where . . . there is only minimal evidence suggesting that a prison's regulation is irrational, running through each factor at length is unnecessary."). Inmates like Singer who challenge the reasonableness of a prison regulation bear the burden of proving its invalidity. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007). The burden is a weighty one: "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132.

Singer's burden is not significantly lightened by the procedural strictures of summary judgment, which require us to draw "all justifiable inferences" in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), because we must distinguish between inferences relating to disputed facts and those relating to disputed matters of professional judgment, *Beard v. Banks*, 548 U.S. 521, 530 (2006). Our inferences as to disputed matters of professional judgment are governed by *Overton*, which mandates deference to the views of prison authorities. *See id.* (citing *Overton*, 539 U.S. at 132). "Unless [Singer] can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.*

With these standards in mind, we turn now to Singer's claims. Singer first asserts that his collection of affidavit testimony about the lack of a relationship between D&D and gangs undermines Muraski's testimony that the D&D ban was implemented in part to quell concerns about gang formation. He thus attacks the district court's conclusion that the D&D ban bears a rational relationship to a legitimate governmental interest, or that the first *Turner* factor favors the prison officials.

The sole evidence the prison officials have submitted on this point is the affidavit of Captain Muraski, the gang specialist. Muraski testified that Waupun's prohibition on role-playing and fantasy games was intended to serve two purposes. The first aim Muraski cited was the maintenance of prison security. He explained that the policy was intended to promote prison security because co-

operative games can mimic the organization of gangs and lead to the actual development thereof. Muraski elaborated that during D&D games, one player is denoted the "Dungeon Master." The Dungeon Master is tasked with giving directions to other players, which Muraski testified mimics the organization of a gang. At bottom, his testimony about this policy aim highlighted Waupun's worries about cooperative activity among inmates, particularly that carried out in an organized, hierarchical fashion. Muraski's second asserted governmental interest in the D&D ban was inmate rehabilitation. He testified that D&D can "foster an inmate's obsession with escaping from the real life, correctional environment, fostering hostility, violence and escape behavior," which in turn "can compromise not only the inmate's rehabilitation and effects of positive programming but also endanger the public and jeopardize the safety and security of the institution."

It is beyond dispute that gangs are "incompatib[le] . . . with any penological system" and that they serve to undermine prison security. *Westefer v. Snyder*, 422 F.3d 570, 575 (7th Cir. 2005) (citing and quoting at length *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005)); *see also Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) ("Prison officials unquestionably have a legitimate interest in maintaining institutional security. . . ."); *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987) ("[I]t is difficult to conceive of a single factor more detrimental to penological objectives than organized gang activity."). Likewise, "[t]here is no question that the rehabilitation of inmates is a legitimate interest of penal institutions," *Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006); *see also Burr v.*

*Pollard*, 546 F.3d 828, 832 (7th Cir. 2008) (noting that rehabilitation is one of the "traditional penological inter-ests"), *cert. denied*, 129 S. Ct. 1382 (2009); indeed, the provision of a "just, humane and efficient program of rehabilitation of offenders" is an express statutory goal in Wisconsin, WIS. STAT. § 301.001. We note that Wisconsin, like all other states, is permitted to pursue its chosen penological goals and objectives so long as its actions in doing so remain within the bounds of the Constitution. *See Ewing v. California*, 538 U.S. 11, 24-25 (2003) ("[O]ur tradi-tion of deferring to state legislatures in making and implementing such important [penological] policy deci-sions is longstanding. Our traditional deference to legisla-tive policy choices finds a corollary in the principle that the Constitution does not mandate adoption of any one penological theory."(quotations and citations omitted)); *Peterkin v. Jeffes*, 855 F.3d 1021, 1032-33 (3d Cir. 1988) ("[N]or is it our role to express our agreement or disagree-ment with their overall policies or theories of prison administration, as long as we find no constitutional violation.")

Singer does not dispute the legitimacy of the penological interests Muraski identified. Nor does he question the legitimacy of unspoken penological interests arguably present here but not cited by Muraski, such as the prison's interest in "[h]olding offenders accountable for their actions through sanctions . . . ." Wis. Dep't of Corr., Mission Statement, http://www.wi-doc.com/vision.htm (last visited Jan. 20, 2010). After all, punishment is a fundamental aspect of imprisonment, and prisons may choose to punish inmates by preventing them from partici-

pating in some of their favorite recreations. *See Sandin v. Conner*, 515 U.S. 472, 485 (1995) ("[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."(quotation omitted)). Instead, the genuine issue of material fact that Singer purports to raise regards the existence of a rational relationship between the indisputably legitimate penological interests cited by Muraski and Waupun's policy banning D&D. Singer maintains that his fifteen affiants delivered compelling testimony challenging Muraski's assertion that D&D could promote gang-related activity. His eleven inmate affiants—who collectively served over 100 years in prison—all testified that they had never heard of any gang-related or other violent activity associated with D&D gameplay or paraphernalia. In Singer's view, this testimony adequately rebuts Muraski's testimony that D&D gameplay mimics the organization of a gang and as a consequence could lead to gang behavior. In our view, it does not.

It is true that Singer procured an impressive trove of affidavit testimony, including some from role-playing game experts, but none of his affiants' testimony addressed the inquiry at issue here. The question is not whether D&D has led to gang behavior in the past; the prison officials concede that it has not. The question is whether the prison officials are rational in their belief that, if left unchecked, D&D could lead to gang behavior among inmates and undermine prison security in the future. Singer's affiants demonstrate significant personal knowledge about D&D's rules and gameplay, and offer

their own assessments that D&D does not lead to gang behavior, but they lack the qualifications necessary to determine whether the relationship between the D&D ban and the maintenance of prison security is "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. In other words, none of them is sufficiently versed in prison security concerns to raise a genuine issue of material fact about their relationship to D&D. (Of course, many of Singer's affiants are present or former inmates, but their experiential "expertise" in prison security is from the wrong side of the bars and fails to match Muraski's perspective.) The expertise critical here is that relating to prisons, their security, and the prevention of prison gang activity. Singer's affiants conspicuously lack such expertise.

Once the prison officials provided the court with a plausible explanation for the D&D policy, that the game's structure (especially its control by the Dungeon Master) mimicked that of gangs, *cf. United States v. Johnson*, 584 F.3d 731, 734 (7th Cir. 2009) (citing testimony that a "Prince" in the Black P-Stone Nation gang "established and enforced rules"); *United States v. White*, 582 F.3d 787, 794 (7th Cir. 2009) ("The Black Disciples embraced a rigid hierarchical leadership structure. A 'king' served as the leader of the Black Disciples and was responsible for developing gang policy and directing the gang's drug-trafficking operations."), and could consequently promote gang development and undermine prison security, the burden shifted to Singer to present evidence to call that explanation into question, *see Jackson*, 509 F.3d at 391. Even with the assistance of all justifiable inferences

in his favor, *see Anderson*, 477 U.S. at 255, Singer cannot carry that burden. His affiants' testimony does little, if anything, to lighten his load. Indeed, his affiants seem to be talking past Muraski. They fail to respond directly—or even obliquely—to Muraski's concern about D&D players looking to Dungeon Masters, rather than to the prison's own carefully constructed hierarchy of authority, for guidance and dispute resolution. Instead, Singer's affiants simply assert that D&D has not to their knowledge incited prison violence or motivated devotees to form a stereotypical street or prison gang.

Singer also claims that his evidence raises doubt as to whether the D&D ban furthers the government's legitimate goal of rehabilitating inmates by limiting their opportunities to engage in escapist behaviors. Again, he proffers purportedly compelling testimony, this time supporting the notion that D&D has a positive rehabilitative effect on prisoners. Singer's affiants are more knowledgeable on this issue. For instance, he offers testimony from Paul Cardwell, chair and archivist of the Committee for the Advancement of Role-Playing Games, an "international network of researchers into all aspects of role-playing games." Comm. for the Advancement of Role-Playing Games, http://www.car-pga.org (last visited Jan. 20, 2010). Cardwell testified that there are numerous scholarly works establishing that role-playing games can have positive rehabilitative effects on prisoners.

Singer's evidence again misses the mark, however. While Cardwell and his other affiants, including a literacy tutor and a role-playing game analyst, testified to a positive

relationship between D&D and rehabilitation, none disputed or even acknowledged the prison officials' assertions that there are valid reasons to fear a relationship running in the opposite direction. The prison officials pointed to a few published circuit court cases to give traction to their views. We view these cases as persuasive evidence that for some individuals, games like D&D can impede rehabilitation, lead to escapist tendencies, or result in more dire consequences. *See Meyer v. Branker*, 506 F.3d 358, 370 (4th Cir. 2007) (noting that defendant Meyer "was obsessed with Dungeons and Dragons," and that "this obsession caused '[him] to retreat into a fantasy world of Ninja warriors'"); *Thompson v. Dixon*, 987 F.2d 1038, 1039 (4th Cir. 1993) (affirming the conviction of one of two men who brought a D&D adventure to life by entering the home of an elderly couple and assassinating them); *cf. Sellers v. Ward*, 135 F.3d 1333, 1335 (10th Cir. 1998) (defense counsel argued that Sellers's addiction to D&D dictated his actions and disconnected him from any consciousness of wrongdoing or responsibility for three murders); *Watters v. TSR, Inc.*, 904 F.2d 378, 380 (6th Cir. 1990) (describing a teenager who committed suicide as "a 'devoted' Dungeons and Dragons player who became absorbed by the game to the point of losing touch with reality").

We recognize that the D&D ban at issue here extends beyond D&D gameplay to encompass D&D-related publications. However, the record before us makes clear that even this aspect of the ban was properly upheld in the district court's grant of summary judgment. Muraski's affidavit expressed concerns not only about

gang behavior but also about potential inmate obsession with escape, both figurative and literal. He testified that D&D "could foster an inmate's obsession with escaping from the real life, correctional environment," placing both the legitimate penological goals of prison security and inmate rehabilitation in peril. The prison officials have thus proffered evidence that the policy prohibiting possession of D&D manuals, strategy guides, character novellas, and other related materials is rationally related to the goal of preventing susceptible inmates from embarking upon a dangerous escapist path; they have "demonstrate[d] that [they] could rationally have seen a connection between the policy" and their ultimate penological goals. *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002) (quotations omitted). Singer's affidavits and briefs were unresponsive to this evidence, and we cannot make his arguments for him. *See Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

Singer has failed to come forward with evidence to call into question that offered by the prison officials on any of the grounds comprising the first prong of his argument. He has not raised a genuine issue of material fact regarding the first *Turner* factor, and we therefore conclude that summary judgment was properly granted to the prison officials with respect to the first *Turner* factor.

Singer further challenges the district court's conclusion that the prison officials satisfied the *Turner* standard as a matter of law by making what can best be described as a halfhearted effort to find error with the district court's

thorough analysis of the other three factors. As to the second factor (alternative means of exercising the right foreclosed by the regulation at issue), Singer asserts that the D&D prohibition is a categorical and permanent ban on its face. He points to the prison officials' concession that inmates at Waupun no longer have the opportunity to engage in D&D or other role-playing games and baldly asserts that the severity of the D&D policy alone suggests that summary judgment was improper. As to the third and fourth factors (impact of accommodation and the existence of "ready alternatives" to the regulation), Singer argues that the D&D ban was an exaggerated response to the government's concerns and serves little practical utility in light of the prison's pre-existing ban on gangs. Each of these arguments is unavailing.

Singer relies on Supreme Court dicta to support his first argument, that the D&D ban should be lifted because it is permanent and categorical. *See Beard*, 548 U.S. at 536 ("Finally, as in *Overton*, we agree that 'the restriction is severe,' and 'if faced with evidence that [it were] a *de facto* permanent ban . . . we might reach a different conclusion in a challenge to a particular application of the regulation.' That is not, however, the case before us." (citation omitted)). He is correct that the ban is a permanent one, but the second *Turner* factor is predominantly concerned with whether alternate means of expression are available to inmates, not with the permanent or categorical nature of the ban. *See Turner*, 482 U.S. at 90. Moreover, the second factor is not in and of itself dispositive; the complete denial of the right to

express oneself through role-playing games is merely some evidence that the ban may be unreasonable. *See Overton*, 539 U.S. at 135. If the other factors are resolved in the prison officials' favor, the *Turner* standard can still be satisfied as a matter of law despite the categorical nature of the ban.

However, we are not convinced that the ban is as un-yieldingly categorical as Singer makes it out to be. He argues that the ban precludes him from playing D&D and therefore he has no alternative means to play D&D. That may be true, but, as the district court pointed out in discounting this circular argument, Singer still has access to other allowable games, reading material, and leisure activities. *See Farmer v. Dormire*, No. 03-4180-CV-C-NKL, 2005 WL 2372146, at *4 (W.D. Mo. Sept. 27, 2005) (observing that strategy games like Risk, Stratego, chess, and checkers remained available to prisoners in the wake of a similar ban). "Where 'other avenues' remain available for the exercise of the asserted right, the courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (citations omitted). Here, that consciousness directs us to conclude that the regulation is not unreasonable. Singer is not precluded from expressing himself by writing another work of fiction, possessing other reading material, or engaging with other inmates in allowable games. These alternatives need not be ideal to Singer for them to adequately satisfy the concerns raised by the second *Turner* factor. *See Overton*, 539 U.S. at 135 ("Alternatives . . . need not be ideal, however; they need only be available.").

The third *Turner* factor requires us to consider the impact that providing an accommodation to Singer will have on guards, other inmates, and on the allocation of prison resources generally. *Turner*, 482 U.S. at 90. In light of Muraski's uncontested testimony that D&D can impede rehabilitation and perhaps even lead to violence and gang activity, it is clear that accommodating Singer's or another inmate's request for an exception to the D&D ban could have significant detrimental effects to inmates and guards alike. The district court concluded that the third *Turner* factor cut in favor of the prison officials because Singer did not call into question Muraski's testimony regarding the possible consequences of accommodating his request to retain possession of D&D materials. We agree that Singer's evidentiary showings in this area were deficient, and we likewise agree with the district court's holding that the third *Turner* factor weighs in favor of the prison officials.

Singer's final argument, a challenge to the fourth *Turner* factor, is that the D&D prohibition is redundant in light of Waupun's preexisting prohibition of gang-related activity and paraphernalia. He asserts that the latter is a ready alternative to the former, rendering the D&D ban an inappropriately exaggerated response to Waupun's security concerns. He does not provide any evidence that the preexisting ban on gang materials was not being enforced or that it was sufficiently broad to cover D&D activity, nor does he argue at this stage of the proceedings that any other reasonable alternative to the ban exists. Singer's reliance upon *Lindell v. Frank*, 377 F.3d 655, 660-61 (7th Cir. 2004), in which we con-

cluded that a prison violated an inmate's First Amendment rights by banning all publication clippings because there were "less exaggerated responses" it could have pursued, is unavailing. There, we were able to discern reasonable alternatives to the ban. Here, because of the two legitimate interests underlying the D&D ban, it is quite difficult, if not impossible, to dream up a realistically implementable alternative policy that would serve Waupun's interests with similar efficacy and efficiency. Singer does not attempt to clear this hurdle, so we, like the district court, conclude that the fourth *Turner* factor cuts in favor of the prison officials as well.

## III. Conclusion

Despite Singer's large quantum of affidavit testimony asserting that D&D is not associated with gangs and that the game can improve inmate rehabilitation, he has failed to demonstrate a genuine issue of material fact concerning the reasonableness of the relationship between Waupun's D&D ban and the prison's clearly legitimate penological interests. The district court's grant of summary judgment is therefore AFFIRMED.