In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3339

DANA WOODS and ERNEST TOPE,

*Plaintiffs-Appellants,*

*v.*

COMMISSIONER OF THE INDIANA
DEPARTMENT OF CORRECTIONS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-01718-JMS-TAB—**Jane E. Magnus-Stinson**, *Judge.*

ARGUED FEBRUARY 24, 2011—DECIDED JULY 19, 2011

Before BAUER, POSNER and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* The plaintiffs are Indiana inmates who filed a class action lawsuit claiming that the Indiana Department of Corrections ("IDOC") violated their First Amendment Rights by prohibiting them from (1) advertising for pen-pals and (2) receiving materials from websites and publications that allow persons to advertise for pen-pals. District Judge Jane E. Magnus-

Stinson granted summary judgment in favor of the IDOC and the plaintiffs appealed. For the reasons set forth below, we find that the IDOC policy on pen-pals is constitutional and affirm.

## I. BACKGROUND

In November 2005, an IDOC investigator named Todd Tappy was directed to examine potential links between pen-pal correspondence and inmate fraud. The investigation was launched as a result of a conversation the IDOC Commissioner had with family members of an elderly man who had allegedly been defrauded by prisoners.

Tappy reviewed Internet pen-pal websites and discovered that 350 inmates of the IDOC had solicited pen-pals using the sites. He later interviewed several pen-pals who had corresponded with inmates through the pen-pal sites. The interviewees reported feeling deceived after sending money to prisoners who had lied about their release dates and offenses of conviction. Tappy reviewed the online profiles of the 350 inmates advertising for pen-pals and found that the majority of these inmates had indeed misrepresented themselves to the public in their postings on the sites. He also looked into the source of funds that were deposited into inmate trust accounts. Unable to confirm that any of the funds inmates received from outside the prison came from persons solicited on the pen-pal sites, at the conclusion of the investigation, the evidence of financial fraud

that Tappy gathered remained largely anecdotal.[1] Nevertheless, he recommended several measures be taken to curb the potential for any future fraud by inmates communicating with pen-pals.

First, he recommended placing a cap on the amount of funds allowed in inmate trust accounts. Second, he recommended implementing a regulation that would limit the source of trust account funds to inmates' family members and other authorized individuals. Third, he recommended that the IDOC prohibit inmates from soliciting or commercially advertising for money, goods or services, including a prohibition on advertising for pen-pals. The IDOC adopted Tappy's second and third recommendations. The inmates now challenge the constitutionality of the latter, arguing that the prohibition against advertising for pen-pals and receiving materials from the pen-pal sites violates the First Amendment.

## II.  DISCUSSION

### A.  Standard of Review

We review a district court judge's grant of summary judgment *de novo. Lim v. Trustees of Indiana University,*

---

[1] Perhaps the strongest evidence that inmates had used the sites to induce financial contributions was one female inmate's admission that she had acquired two pen-pal fiancés, each of whom—unbeknownst to the other—sent substantial sums of money to her on the belief that they would marry following her release.

297 F.3d 575, 580 (7th Cir. 2002). The *de novo* standard requires a reviewing court to view the facts and draw all reasonable inferences in favor of the nonmoving party, here the plaintiffs. *Id.* In cases such as the one before us, we are careful to distinguish between "inferences relating to disputed facts and those relating to disputed matters of professional judgment." *Singer v. Raemisch,* 593 F.3d 529, 534 (7th Cir. 2010). Matters of professional judgment, including decisions rendered by prison authorities, are accorded great deference. *Id.*

### B.  Constitutionality of the Pen-Pal Policy

As indicated, the plaintiffs claim that the IDOC policy prohibiting advertising for pen-pals violates their constitutional rights under the First Amendment.

At the outset, we note that courts have upheld the curtailment of First Amendment rights fairly broadly in the prison context.[2] As the Supreme Court has articulated the governing standard, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

The plaintiffs concede that a policy designed to prevent prisoners from developing relationships with outside

---

[2] *See, e.g., Turner v. Safley,* 482 U.S. 78 (1987) (upholding a Missouri prison regulation that prohibited intra-prison correspondence); *Singer v. Raemisch,* 593 F.3d 529 (7th Cir. 2010) (upholding a Wisconsin regulation that prohibited prisoners from playing the game "Dungeons and Dragons").

persons only to defraud them by inducing financial contributions is "obviously a legitimate governmental objective." App. Br. at 17. Therefore, the only real question for our review is whether the regulation enacted was reasonably related to the legitimate objective of curtailing inmate fraud.

Several factors are relevant to the reasonableness inquiry. First, there must be a "valid, rational connection" between the regulation and the objective set forth to justify it. *Turner,* 482 U.S. at 89. Second, the inmates must have an alternative means of exercising the restricted right. *Id.* at 90. Third, the impact of accommodating the asserted right on prison staff, other inmates, and prison resources generally must be considered. *Id.* Last, the regulation must not be an "exaggerated response" that ignores an alternative which would accommodate the inmates' First Amendment rights at a *de minimus* cost to legitimate penological interests. *Id.* at 90-91. The burden is not on the IDOC to prove the validity of the regulation; rather, it falls to the inmates to disprove it. *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003).

1.  *Existence of a "Valid, Rational Connection" Between the Regulation and Its Objective*

We begin with the first of the *Turner* factors, which acts as a threshold matter "regardless which way it cuts." *Singer,* 593 F.3d at 534. As Justice O'Connor wrote in *Turner* and Judge Tinder cited in *Singer*, "[A] regulation

cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89-90.

The plaintiffs' argument on this point seems to be that the regulation in question is *unnecessary* rather than remote. As argued at page 3 of their reply brief, "The fraud concern that gave rise to the ban . . . is completely addressed by safeguards currently in place." We will address their argument that the restriction on advertising for pen-pals is gratuitous in our discussion of the last *Turner* factor, which deals with the existence or absence of a "ready alternative" to the contested regulation. For now it suffices to say that the plaintiffs have not directly challenged the regulation as being remote or arbitrary.

A prohibition on advertising for pen-pals relates fairly directly to the goal of preventing fraud since it cuts off the inmates' access to potential victims. The plaintiffs have not raised any issue of material fact on this point. Therefore, summary judgment was appropriate with respect to the first factor.

2. *Existence of an Alternative Means of Exercising the Restricted Right*

The second *Turner* factor requires us to examine whether an alternative means of exercising the plaintiffs' First Amendment rights remains available to them despite the restriction that has been imposed. The plaintiffs

concede that on the face of the matter, their First Amendment rights are not seriously impeded by the pen-pal policy, "given that the [IDOC] allows prisoners to communicate with virtually anyone and everyone, provided they are not obtained through a pen-pal site." App. Br. at 23. Though inmates cannot advertise for pen-pals, they can still send and receive nearly unlimited correspondence. The crux of the plaintiffs' argument is that the ample alternative channels of communication that remain available to them are illusory; inmates such as those in the instant case may not be able to find persons in the outside world with whom to communicate without advertising on pen-pal sites.

While we are mindful that some inmates do not maintain relationships with family and friends following their incarceration, it cannot be said that alternative means of communication do not exist for such inmates. As deposition testimony in this case revealed, inmates may obtain pen-pals through various groups that visit the prison. They may also cultivate contacts in the outside world through other inmates, their attorneys, and by their own initiative. Inmates are allowed to receive newspapers and magazines; nothing prohibits them from reaching out to those who may be sympathetic to their plight. As such, we cannot conclude that the alternative means of communication available to them are illusory.

Finding that viable alternative means of communication remain available to IDOC inmates, we move to the third of the four *Turner* factors.

###### 3. *Impact of Accommodating the Inmates' Exercise of the Restricted Right*

The third *Turner* factor requires us to examine the impact that voiding the regulation would have on prison staff, other inmates, and the allocation of prison resources. *Turner,* 482 U.S. at 90.

The district court made much of the effect that lifting the ban might have on the amount of mail IDOC officials would have to process, citing increased usage of the Internet in recent years as an indicator of projected growth in the number of persons interested in Internet solicitation of pen-pals. We find the district court's hypothesis that increased Internet usage would lead to increased use of pen-pal sites and therefore an increased amount of incoming mail to prisons tenuous at best. While it is undoubtedly true that Internet usage has increased in recent years, the figures cited do not appear to have been specific to the prison population; furthermore, it cannot be reasonably inferred that the more one uses the Internet, the more one becomes interested in seeking out pen-pals.

More relevant to our inquiry is whether lifting the ban would re-open a channel of communication that creates a large potential for fraud to occur. We believe that it would. The record indicates that Tappy spent significant time investigating the inmates' use of pen-pal sites and interviewing persons who felt they had been defrauded; this is not the type of activity prison officials should regularly have to conduct. The results of the investigation were sufficiently unsettling to warrant the imple-

mentation of preventive measures against fraud. There-fore, we find that the IDOC was reasonable in its belief that, absent a ban on Internet solicitation, some inmates would continue to exploit the Internet's broad reach and relative anonymity for an improper purpose, including fraud. Not only is such behavior incompatible with the rehabilitative goals of incarceration, it also unduly distracts prison officials from the day-to-day affairs they must manage in order to maintain a safe atmosphere for everyone in the prison environment. The Internet is a breeding ground for mischief of the sort the IDOC Commissioner feared. When prison officials are rational in their belief that, if left unchecked, an ac-tivity will lead to fraud, we hold that banning the activity does not violate inmates' First Amendment rights.[3]

### 4.  *Existence of a Ready Alternative*

The last of the *Turner* factors asks whether an alterna-tive to the challenged regulation would fully accom-modate the inmates' First Amendment rights at a *de minimus* cost to legitimate penological interests. We disagree with the plaintiffs' contention that such an obvious alternative exists.

---

[3] *See Singer,* 593 F.3d at 536 (holding that although playing the game "Dungeons and Dragons" had not incited gang behavior in the past, since it was rational to believe that con-tinuing to allow inmates to play the game could lead to such behavior in the future, banning it did not violate the First Amendment).

After Tappy reported the results of his investigation, in addition to banning inmates from advertising for pen-pals, the IDOC also placed limits on who can put funds into inmate trust accounts. The plaintiffs argue that since IDOC inmates may now only receive funds from non-family members who are enumerated on the inmates' visiting lists, the fraud concern has been addressed and the pen-pal prohibition is gratuitous. Certainly the restriction placed on the deposits helps prevent fraud, but it can hardly be said to eradicate it. As the IDOC points out, a person on an inmate's approved list could act as an intermediary who receives funds and then deposits them into the inmate's trust account. In this scenario, fraud could go quite easily undetected by prison officials.

In our view, no single regulation can serve as a catch-all for eliminating the potential for fraud. Though we agree that the restriction on deposits goes a long way toward accomplishing the stated goal, we defer to the judgment of the prison administrators when it comes to deciding whether a ban on solicitation is also necessary. This is consistent with our circuit's precedent of granting deference to matters of professional judgment by prison officials. *See Singer*, 593 F.3d at 534 (quoting *Overton*, 539 U.S. at 132, for the proposition that "[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them").

We close by noting that constitutional rights are not eradicated by one's incarceration; the liberties enjoyed by the citizenry at large remain available to incarcerated individuals except to the extent that the exercise of such liberties is at odds with the objectives and administration of an effective prison system. Using pen-pal websites to engage in fraud is antithetical to the rehabilitative goals of confinement. Here, the IDOC reasonably perceived that continuing to allow inmates to use the sites would passively enable fraud. The regulation enacted to prevent it squarely addressed the threat and is therefore constitutional.

### III.  CONCLUSION

For the reasons set forth above, we find that the regulation in dispute is reasonably related to the legitimate penological objective of preventing inmate fraud. Since the plaintiffs have not managed to overcome the hefty burden of disproving the validity of the regulation in their analysis of the *Turner* factors, we AFFIRM.